Case 4:17-cv-00029-JLK-JCH   Document 19   Filed 08/29/18   Page 1 of 19
Pageid#: 1172

CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

8/29/2018

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| RAYMOND P., | ) | |
|     Plaintiff, | ) | Civil Action No. 4:17-cv-00029 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | By:    Joel C. Hoppe |
| Social Security, | ) |        United States Magistrate Judge |
|     Defendant. | ) | |

Plaintiff Raymond P. asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 13. Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, I recommend that the presiding District Judge reverse the decision and remand the case under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

1

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Raymond P. filed for DIB on April 9, 2014, alleging disability because of post-traumatic stress disorder, depression, migraine headaches, problems with his right knee and shoulder, and "osteomyelitis resulting in a lumbar corpectomy." Administrative Record ("R.") 90, ECF No. 10-1. Disability Determination Services ("DDS"), the state agency, denied his application initially in July 2014, R. 104, and again in October of the same year, R. 121. On April 25, 2016, Raymond P. appeared with counsel and testified at an administrative hearing before ALJ Brian Rippel. *See* R. 35–88. Raymond P.'s wife, Sharon, and a vocational expert ("VE") also testified at this hearing. R. 69–76, 77–88.

ALJ Rippel issued an unfavorable decision on May 12, 2016. R. 17–30. He first found that Raymond P. had not worked since July 23, 2013, the alleged disability onset date, and that he met the Act's insured-status requirements through March 31, 2016.[1] R. 19. At steps two and three, he found that Raymond P.'s "spine disorder status-post surgery; obesity; migraine headaches; right shoulder disorder; anxiety; post-traumatic stress disorder; bilateral knee degenerative joint disease; MRSA [infection]; and osteomyelitis" were severe medical impairments, but that they did not meet or medically equal any of the relevant Listings. R. 19–22

---

[1] To qualify for DIB, Raymond P. "must prove that [he] became disabled prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 656; *see* 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131 (2015).

3

(punctuation corrected). ALJ Rippel then evaluated Raymond P.'s residual functional capacity ("RFC") as it existed through March 31, 2016. R. 22–28. He found that Raymond P. could have done "sedentary work"[2] as defined in the regulations, but with additional limitations:

> he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; could occasionally reach overhead with the right upper extremity; and could have no exposure to hazards, such as unprotected heights and hazardous machinery. In addition, the claimant needed the flexibility to use a cane when walking. He was limited to simple, routine tasks involving entry-level, unskilled work, occasional changes in the work setting, and no interaction with the public. The claimant could have occasional interactions with coworkers and supervisors, to include tandem tasks. When interaction would have taken place, they needed to be brief and superficial.

R. 22. Finally, based on this RFC finding and the VE's testimony, ALJ Rippel concluded that Raymond P. was not disabled through March 31, 2016, because he still could have performed certain widely available unskilled sedentary occupations, such as assembler, machine inspector, or semi-conductor production worker. R. 30; *see* R. 78–86. The Appeals Council denied his request for review, R. 1–3, and this appeal followed.

## III. Discussion

Raymond P. asks the Court to reverse the Commissioner's final decision because ALJ Rippel "failed to give proper controlling weight" to a treating psychiatrist's opinion that Raymond P.'s medical conditions would not have allowed him to maintain employment during the relevant time, Pl.'s Br. 3 (citing R. 506), and "neglectfully failed to consider the combined effects of all of [Raymond P.'s] impairments, combined with the effects from [his] medicine regimen," *id.* at 5, when evaluating his RFC. He also takes issue with ALJ Rippel's finding that two of Raymond P.'s "admitted" recreational activities during the relevant time—namely

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). A person who can meet these lifting requirements can perform "the full range of sedentary work" if he or she can sit for about six hours and stand and/or walk for about two hours in a normal eight-hour workday. *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); *see also* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

learning to waltz and firing a handgun—were "inconsistent with" Raymond P.'s "complaints of disabling symptoms and limitations" and supported the conclusion that he was not disabled. R. 26; *see* Pl.'s Br. 3–5. Raymond P.'s first objection is meritless, but his second and third objections are persuasive and warrant reversal and remand to give the Commissioner another opportunity to explain her ruling.

A.   *Treating Psychiatrist's Opinion*

Raymond P. challenges ALJ Rippel's analysis of a June 2014 opinion from Masoud Hejazi, M.D., that "[b]ased on [his] assessment" of Raymond P., he did "not foresee him to be able to carry any part-time or full-time job related to his medical and psychiatric condition at th[at] time and most likely in the long-term future he would not [be] able to hold a job." Pl.'s Br. 3 (citing R. 506). ALJ Rippel gave this opinion "limited weight" because, "even though Dr. Hejazi [was] a treating medical specialist," the psychiatrist's "findings appear[ed] to adopt the claimant's allegations without balance or objectivity" and the "record indicate[d] that outpatient mental health ha[d] been effective to reduce the claimant's symptoms and make him fairly stable." R. 27–28. Raymond P. argues that Dr. Hejazi's opinion deserved "controlling weight," or at least "more weight" than the DDS medical consultants' less restrictive assessments of his psychiatric conditions, because Dr. Hejazi's opinion was both "uncontradicted" and "consistent with other substantial evidence" in the record.[3] Pl.'s Br. 3–4 (citing 20 C.F.R. § 404.1527(c)(2) (2016)).

---

[3] In making the former assertion, Raymond P. mistakenly overlooks two DDS consultants' subsequent medical opinions that his severe anxiety disorder was not disabling and that he could have worked on a regular and continuing basis as long as the work involved simple, routine tasks and superficial interaction with other people. *Compare* R. 506, *with* R. 94–101, 111–20. ALJ Rippel gave these medical opinions "partial weight" because the consultants reviewed Raymond P.'s medical records and most of their specific work-related mental limitations were "consistent with the claimant's level of outpatient treatment and symptoms, including hallucinations, mood lability, hypervigilance, and anxiety." R. 27; *see* R. 25 (citing Exs. 6F, 8F, 9F, 12F, 17F). Raymond P. does not challenge this finding on appeal.

5

A treating source's *medical opinion* is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. § 404.1527(c)(2). "Medical opinions" are statements from "acceptable medical sources," such as physicians or psychologists, that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, specific functional limitations, and remaining abilities. *See* 20 C.F.R. § 404.1527(a)(1). They are distinct from medical-source "legal conclusions," which are "opinions on issues on issues reserved to the [Commissioner], such as statements by a medical source that the claimant is disabled or unable to work." *Morgan v. Barnhart*, 142 F. App'x 716, 721–22 (4th Cir. 2005) (internal quotation marks and brackets omitted); 20 C.F.R. § 404.1527(d). The latter "issues are reserved to the Commissioner because they are administrative findings that are dispositive of a case," i.e., fully crediting the physician's opinion on the issue would require the Commissioner to award disability benefits. 20 C.F.R. § 404.1527(d). Thus, while "[t]he ALJ is not free . . . simply to ignore" such relevant evidence, he is under no obligation to give a treating physician's legal conclusions any heightened evidentiary value" based solely on the source's medical qualifications. *Morgan*, 142 F. App'x at 722; *see* 20 C.F.R. § 404.1527(d)(3).

Dr. Hejazi's opinion that Raymond P.'s "medical and psychiatric conditions" prevented him from working in June 2014 and "most likely in[to] the long-term future," R. 506, is a legal conclusion reserved to the Commissioner, 20 C.F.R. § 404.1527(d)(1). ALJ Rippel gave this opinion "limited weight" because he concluded that Dr. Hejazi's "findings appear[ed] to adopt the claimant's allegations without balance or objectivity" and the "record indicate[d] that outpatient mental health ha[d] been effective to reduce the claimant's symptoms and make him

6

fairly stable." R. 27–28 (citing Exs. 3A, 6F, 8F, 9F, 12F, 17F). Because these were "specific and legitimate reasons" to discount even a treating-source medical opinion, *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (citing 20 C.F.R. § 404.1527(c)), the Court "must defer" to ALJ Rippel's determination unless it is not supported by substantial evidence, *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015). Raymond P. vaguely objects that Dr. Hejazi's opinion was "consistent with other" unidentified evidence, but he does not cite any specific error in ALJ Rippel's contrary conclusion or point to any evidence not considered by the ALJ that might have changed the limited weight he assigned the opinion, Pl.'s Br. 3–4. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

ALJ Rippel's rationale is amply supported by relevant evidence in the record, including Dr. Hejazi's April 2014 comment that Raymond P. "present[ed] *himself* to be totally disabled at th[at] point" despite having "done very well" on medications in the eleven months since his then-most recent psychiatric visit. R. 644–45 (Ex. 9F) (emphasis added). Indeed, Dr. Hejazi's June 2014 opinion that he did "not foresee [Raymond P.] to be able to hold any part-time or full-time job in the foreseeable future," R. 506, also appears verbatim in the April 2014 progress note immediately before his comment that Raymond P. "present[ed] himself to be totally disabled," R. 645. *Cf. Craig*, 76 F.3d at 590 (concluding that the ALJ properly discounted a treating physician's "conclusory opinion based upon [the claimant's] subjective reports of pain" that the claimant "was disabled . . . and would be disabled 'indefinitely' because of 'aching all over'"). ALJ Rippel's finding that "outpatient mental health ha[d] been effective to reduce" Raymond P.'s psychiatric symptoms and made him "fairly stable" is supported by Dr. Hejazi's opinion that those same symptoms were "responding slowly, but rather consistent[ly]" to prescription medications and "intensive psychotherapy" as of July 2014, R. 505 (Ex. 8F); and a DDS

7

reviewing psychologist's opinion that as of October 2014, his symptoms were "fairly well stabilized on medication and there ha[d] been no acute exacerbation requiring aggressive changes in medications, or requiring a higher level of care," R. 112 (Ex. 3A), besides semi-regular outpatient appointments to manage prescriptions for "Venlafaxine, Quetiapine, Lithium, Clonazepam, and Geodon," R. 25. The ALJ also reasonably found that the objective findings on mental-status examinations were generally unremarkable throughout the relevant period even when Raymond P. reported being "totally incapacitated" by mood swings, anxiety, and agitation, R. 645. *See* R. 444–54, 452–55, 644–48, 804–07, 1001–02 (Exs. 6F, 9F, 12F, 17F). Accordingly, I find no error in ALJ Rippel's analysis of Dr. Hejazi's conclusory opinion that Raymond P.'s psychiatric condition likely rendered him unable to "hold a job." R. 506.

*B.     RFC Assessment*

Raymond P.'s other arguments generally impugn the ALJ's RFC determination. *See* Pl.'s Br. 4–5. A claimant's RFC represents his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite his medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted); *see* 20 C.F.R. § 404.1545. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting effects of impairments that are supported by the medical evidence or the claimant's credible reports of pain or other symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015).

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529; *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). "First, the ALJ looks for objective medical evidence showing a condition that

8

could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *id.*, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 639. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. When conducting this inquiry, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that he is disabled by pain or other symptoms caused by a medical impairment or related treatment. 20 C.F.R. § 404.1529(c). The ALJ also must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). The ALJ's articulated reasons for discounting a claimant's complaints need only be legally adequate and supported by substantial evidence in the record. *See Mascio*, 780 F.3d at 639; *Bishop*, 583 F. App'x at 68 (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

More generally, the ALJ's RFC assessment must "include a narrative discussion describing" how medical facts and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and explaining why he discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977), that supports the individual's claim for disability benefits, *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017). This discussion should "build an accurate and logical bridge from the evidence to [the ALJ's] conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a certain ability to sustain

work-related activities, *Mascio*, 780 F.3d at 636–37. "In other words, the ALJ must *both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from that evidence to his conclusion" that the claimant is not disabled. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (internal quotation marks and brackets omitted).

Raymond P. argues that ALJ Rippel's RFC assessment fell short of these standards because he "neglectfully failed to consider the combined effects of all of [Raymond P.'s] impairments, combined with the effects from [his] medicine regimen," Pl.'s Br. 5, and mischaracterized some of Raymond P.'s recreational activities to support the conclusion that he was not disabled because he still could have done certain widely available sedentary unskilled jobs, *see id.* at 3–5 (citing R. 24, 26). He also correctly points out that each paragraph in ALJ Rippel's impairment-by-impairment summary of the medical record ends with a conclusion that the just-recited evidence (or the "record" generally) either "supports" his RFC determination or contains "nothing to warrant" more restrictive limitations, *id.* at 4; *see* R. 23, 24, 25, 26, but that the ALJ offered no meaningful analysis to explain how the evidence supported his conclusions.

"A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (internal citation omitted). The ALJ need not discuss every piece of relevant evidence, but he "must evaluate the record fairly," *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (per curiam), and provide enough "analysis of the evidence to allow the [reviewing] court to trace the path of his reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). *See Lewis*, 858 F.3d at 869; *Hines*, 453 F.3d at 556. Similarly, it is not enough for the ALJ to simply summarize all the relevant evidence if he then

fails to explain how he ostensibly resolved material ambiguities or conflicts in the record and why the credited evidence supports his findings and conclusions. *See Woods*, 888 F.3d at 695; *Monore*, 826 F.3d at 191. ALJ Rippel's written decision does not meet these minimum standards.

The main problem is that too "[m]uch of the ALJ's RFC assessment was devoted to summary and not enough to analysis." *Lacek v. Colvin*, Civ. Action No. CBD-13-2046, 2014 WL 2865992, at *8 (D. Md. June 23, 2014) (reversing and remanding on these grounds); *see also Boston v. Barnhart*, 332 F. Supp. 2d 879, 888 (D. Md. 2004) (reversing and remanding where the ALJ set out "a detailed summary of the medical evidence, but fail[ed] to engage in any discussion as to how this evidence support[ed] [the] RFC determination"). Raymond P. claims that he could not work during the relevant time primarily because he suffered constant severe pain and significant physical limitations after having several surgeries on his spine and right shoulder, as well as degenerative joint disease in both knees and limited motion in his right ankle. Additionally, the prescription medications he took for those and other conditions made him extremely drowsy. *See* R. 39–40, 48–54, 56–57, 58–59, 61, 480. ALJ Rippel summarized much of the medical and other evidence bearing on these complaints, R. 23–25, but he never explained *how* he concluded *based on this evidence* that Raymond P. could actually meet the demands of gainful employment, *Woods*, 888 F.3d at 694, even if the RFC determination included fairly significant restrictions[4] on his work-related activities and environments, *see* R. 20–21, 23–28. Meaningful substantial-evidence review is not possible where, as here, the court is

---

[4] "Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations," but are not presumed disabled. SSR 96-9p, 1996 WL 374185, at *3. Raymond P. claims that he was disabled during the relevant time because the combination of his physical and mental impairments, along with the side effects from multiple prescription medications, would not have allowed him to perform even unskilled, sedentary work on a regular and continuing basis. *See* R. 40; Pl.'s Br. 4–5.

"left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions." *Mascio*, 780 F.3d at 637.

"A full explanation by the ALJ [was] particularly important in this case because [the] medical record include[d] a fair amount of evidence supportive of [Raymond P.'s] claim." *Radford*, 734 F.3d at 296. Raymond P. alleges that he became disabled in late July 2013, around the same time he had surgery to repair recurrent labral tears in the right shoulder. R. 675. Raymond P. was scheduled to have another surgery on his right shoulder in December 2013, after he fell and damaged the repair. R. 749. In January 2014, Raymond P. went to the Salem Veterans' Affairs Medical Center ("Salem VAMC") for routine treatment of his shoulder. R. 274; *see* R. 281. He also reported increasing back pain and muscle spasms for the past several weeks after his back "gave away" while holding up his stepfather, who was partially "paralyzed due to a stroke" and had risen suddenly from his chair requiring Raymond P. to hold him. R. 274. Raymond P.'s description of the treatment he received in the intervening weeks "concerned" his orthopedic surgeon, who ordered an MRI of the thoracic spine be performed immediately. *Id.*

The MRI showed "T10 and T11 osteomyelitis and diskitis with paravertebral soft tissue inflammatory and phlegmon changes," "posterior longitudinal ligament elevation with flattening of thecal sac and contacting cord with no cord edema." R. 276. A bone biopsy showed "Methicillin resistant Staphylococcus aureus bacteremia" present deep in the thoracic spine. R. 273. The attending neurosurgeon did not believe surgical intervention was appropriate at that time, and the infectious disease specialist prescribed an extended course of intravenous antibiotics to treat the MRSA infection, which required a central line and home-healthcare services. *See* R. 272–73, 314–15. The specialist removed the line after twelve weeks to see if the residual MRSA infection "had any clinical response, but [Raymond P.] relapsed" and continued

12

to report severe intractable back pain. R. 326; *see* R. 311, 341, 493. In March 2014, Raymond P.'s treating neurologist noted that he would not administer Botox injections for his recurrent migraines until Raymond P. "recover[ed] from this terrible deterioration in his health." R. 672.

On April 12, Raymond P. went to the emergency room complaining of severe back pain that increased "significantly" with movement and weightbearing. R. 338, 341. He was admitted to the hospital before undergoing a previously scheduled "T9 through T11 vertebrectomy and fusion" on April 16. R. 338; *see* R. 372–73. The treating neurosurgeon who performed this procedure noted "quite severe collapse of the T10 vertebral diskitis at the T10-T11 level" and "compression of the spinal cord at the T10 level secondary to retropulsion of bone and infectious material into the spinal canal at this level." R. 345; *see also* R. 309–10, 681–82 (March 2014 MRI of the thoracic spine showing "progressive collapse" and "near-complete loss" of height and kyphosis at T10-T11). Raymond P. continued his various pain medications and underwent a second round of long-term intravenous antibiotics and physical therapy after this surgery. *See* R. 326–27, 353, 370, 371, 493, 498, 775. In June 2014, he received a TENS unit, single point cane, hinged knee brace, and unilateral ankle-foot orthotic from the Salem VAMC orthopedic clinic. *See* R. 411–13. The orthotic was prescribed for weakness and limited mobility in the right ankle, R. 411, which is the same impairment underlying Raymond P.'s 10% service-related veteran's disability rating.[5] *See* R. 540–41, 550, 874–76, 925. On January 26, 2016, Raymond P. "stopped by [a] clinic" at the Salem VAMC "to report that he ha[d] been having problems walking, falling down, loss of feeling in his legs and losing the ability to walk" for the past three months and was experiencing a severe "stabbing pain" near where he had spinal surgery that radiated into his hips

---

[5] ALJ Rippel gave this disability rating "limited weight" because he found that the record did "not show any treatment, complaints, or symptoms related to the claimant's ankle during the relevant time frame." R. 26. The ALJ's reasoning is questionable. *See* R. 874–76 (pain management specialist noting in September 2015 that Raymond P. needed a new "foot brace for the foot drop" and atrophy developing in the right ankle).

13

and caused him to lose control of his legs. R. 986. In February 2016, Raymond P. had a neurostimulator permanently implanted near the thoracic-lumbar spinal cord because his chronic "intractable" residual back pain "did not respond well to multiple injections" or physical therapy and he was eager to "wean off the narcotic pain meds if any procedure may give him better relief." R. 889; *see* R.870, 874–75, 954–55.

Raymond P. also attended physical therapy for the pain and limited mobility in his right shoulder during the relevant time, but his physicians avoided more invasive treatments, such as steroid injections or surgery, for more than a year while Raymond P. recuperated from the MRSA infection and spinal-fusion surgery. *See* R. 775, 882. He had a second arthroscopic surgery on the right shoulder on September 8, 2015, followed by another course of intensive physical therapy. R. 884, 1017. His treatment goals included being able to "elevate [that] arm to at least 90 degrees with [a] 5 lb weight" and minimal reported pain. R. 884. Six weeks later, Raymond P. told his surgeon that the shoulder was "getting better," R. 1059, but he continued to complain of pain and had limited mobility during physical therapy sessions, R. 880. On October 27, the physical therapist opined that "the extent of the injury to his r[ight] shoulder may limit his rehab potential." R. 880. On December 1, 2015, Raymond P. told his surgeon that he was "pleased" with the increased mobility in his shoulder and that it was "feeling better enough that he has been able to practice with his handgun." R. 1017 (spelling corrected).

At the hearing in April 2016, Raymond P. testified that could sit and stand for five to ten minutes each, R. 50, and he could walk for five to seven minutes before his back would "start spasming," R. 51. He used a prescription cane to walk and wore an ankle-foot orthotic on his right leg, which impaired his sensation such that he could not drive. R. 63–64. Raymond P. had "very little grip" strength or sensation remaining in his right dominant hand, and he had not been

14

able to lift his right arm above shoulder level since roughly late 2015. *See* R. 41, 53–54. Several of his medications made him so drowsy that he was "constantly falling asleep on and off" when watching television, and he would start "nodding off" when sitting for just a few minutes, even in the middle of a conversation. R. 59. Sharon P. confirmed that these medications left her husband "in a very low cognitive state" in part because he was "very groggy" and "constantly could be nodding off all hours of the day." R. 73–74.

At the outset of his RFC assessment, ALJ Rippel summarized Raymond P.'s testimony and found that his medically determinable impairments could reasonably be expected to cause these symptoms, but that his statements describing their intensity, persistence, and limiting effects were "not entirely consistent with the medical and other evidence in the record for the reasons explained in [the ALJ's] decision." R. 23. Then, after summarizing much of the medical evidence discussed above in an impairment-by-impairment assessment of Raymond P.'s functional capacities, ALJ Rippel gave only two specific reasons to doubt his testimony, neither of which was directly grounded in the medical record. R. 26. First, he found that Raymond P.'s daily activities, including preparing simple meals, folding laundry, socializing and playing cards, shopping on the computer, watching television, and once spending a night "watching over" his mother-in-law, "reveal[ed] a significantly greater physical and mental capacity than alleged" and were "not limited to the extent one would expect[] given the complaints of disabling symptoms and limitations." *Id.* Second, ALJ Rippel found that Raymond P. "provided inconsistent information regarding [his] daily activities" because he first denied, and then admitted, "learning to waltz" after he got a leg brace and "firing a couple of rounds" on his handgun after his second shoulder surgery. *Id.* At the end of the RFC assessment, ALJ Rippel also acknowledged Sharon

15

P.'s corroborating testimony and concluded without explanation that his RFC restrictions "adequately accommodate[d]" her description of Raymond P.'s functional limitations.

The record does not support ALJ Rippel's rationale for discounting Raymond P.'s subjective complaints. First, "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which [he or] she can perform them." *Woods*, 888 F.3d 694. Raymond P. admitted engaging in the daily activities that ALJ Rippel identified, but he also explained that he shopped on the computer "on holidays" for only five to ten minutes, he played cards once a week, and he "constantly" fell asleep when watching television or doing other sedentary activities, including talking to people. R. 59, 221–22. ALJ Rippel did not acknowledge Raymond P.'s qualifying statements anywhere in his written decision. *See* R. 23–28; *cf. Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010))). Second, even accepting the ALJ's description at face value, the listed activities say very little about Raymond P.'s ability to perform gainful sustained work activity during an eight-hour day for five days a week. *See Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017). For example, although Raymond P. did tell his physical therapist in November 2013 that "he was up most of the night [before] . . . watching over his mother-in-law," this progress note does not contain any information about what, if anything, Raymond P. did to care for her on that one occasion. R. 734. Moreover, this isolated comment came relatively early in the relevant period and several months before Raymond P. suffered "terrible deterioration in his health," R. 672, after contracting MRSA and undergoing spinal fusion therapy, a second shoulder surgery, and having a neurostimulator permanently implanted in his spinal cord.

Finally, ALJ Rippel's conclusion that Raymond P. provided "inconsistent information" about two of his "admitted" recreational activities relies on a selective reading of the record. In October 2015, Raymond P. told his shoulder surgeon that his new leg brace was "making a huge difference in his life" and he was "even learning to waltz again to be able to surprise his wife." R. 1059. When ALJ Rippel asked for "help in understanding" this notation, Raymond P. explained under oath that he "did try to learn how to waltz again" at that time, but "[i]t lasted all of about five minutes" because he was only able "to do a few steps," and he had "not been able to do anything with it since." R. 68. Sharon P. confirmed that her husband's comment to the shoulder surgeon was merely aspirational and did not accurately reflect his physical abilities during the relevant period. R. 72. Raymond P. offered a similar explanation when ALJ Rippel asked about a comment he had made in December 2015 that his right shoulder was "feeling better enough that he ha[d] been able to practice with his handgun," R. 1017 (spelling corrected). *See* R. 67–68 (explaining that he "did try to practice" with his handgun, but he was only able to fire two rounds because he could not lift his arm high enough and his hand shook too much). Sharon P. again confirmed that this comment was largely aspirational because he enjoyed shooting as a hobby and that her husband had not shot a handgun since his surgeries. R. 71–72. ALJ Rippel did not mention Raymond and Sharon P.'s explanations in concluding that Raymond P.'s abilities to waltz and "fire a few rounds" on a handgun were "inconsistent" with his complaints of disabling pain and functional limitations. R. 26; *cf. Hines*, 453 F.3d at 566 ("The deference accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence." (citing *Diaz*, 55 F.3d at 307)). "This conclusion was not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two." *Hines*, 453 F.3d at 565. Moreover, given the considerable

17

medical evidence depicting serious, debilitating impairments and limitations documented throughout the longitudinal medical record, these one-time, brief activities do not present a reasonable basis to discount Raymond P.'s report of disabling symptoms.

On remand, the Commissioner must consider and apply the applicable legal rules to all the evidence in the record relevant to Raymond P.'s subjective complaints and alleged functional limitations, explain how any material inconsistencies or ambiguities were resolved, and provide a logical link between the evidence she found credible and the RFC determination.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Plaintiff's Motion for Summary Judgment, ECF No. 16, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 17, **REVERSE** the Commissioner's final decision, **REMAND** the case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 29, 2018

Joel C. Hoppe
United States Magistrate Judge